694 So.2d 1375 (1996)
Henry E. MANN, Judy F. Mann, and Abyss Sand and Gravel, Inc.
v.
The BANK OF TALLASSEE.
2950768.
Court of Civil Appeals of Alabama.
December 20, 1996.
Rehearing Denied February 14, 1997.
Certiorari Denied May 16, 1997.
*1377 Thomas T. Gallion III and Susan E. Kennedy of Haskell, Slaughter, Young & Gallion, Montgomery; and Fred Gray, Jr., of Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee, for appellants.
Sterling G. Culpepper, Jr., and Donald R. Jones, Jr., of Balch & Bingham, Montgomery; John I. Cottle, III of Bowles & Cottle, Tallassee; and Albert Bulls, Tuskegee Institute, for appellee.
Alabama Supreme Court 1960903.
PER CURIAM.

I. Background

A. The Beginning of Abyss Sand and Gravel, Inc.
In late 1990, Henry Mann and his wife Judy Mann gave business assistance to Judy's father, Herbert Baker, who owned a gravel business in Macon County. Mr. Baker had been experiencing some financial problems and had been forced into bankruptcy. The Manns decided that they would purchase the gravel pit, form a corporation to run the business, and employ Mr. Baker to oversee the corporation's day-to-day operations. Judy worked diligently to secure a sizable gravel contract with Globe Metallurgical, Inc. ("Globe"), and then she and her husband went to the Bank of Tallassee ("Bank") to apply for a loan to buy Mr. Baker's business out of bankruptcy. The Bank and the Manns [1] entered into this original loan agreement in April 1991. The Manns formed Abyss Sand and Gravel, Inc. ("Abyss"), and they were soon in business.

*1378 B. The Foreclosure
Despite their belief that the Globe contract would ensure a profitable business, the Manns found themselves struggling to make the payments on their loan and borrowing even more from the Bank to fund Abyss's operating expenses. Eventually, the Manns were in default on several loans with the Bank, and the Bank foreclosed. In addition to foreclosing on the real estate, the Bank seized the gravel pit equipment and retained the Manns' personal certificate of deposit ("CD").

C. The Lawsuit
The Manns disputed the Bank's right to seize the equipment and the CD, and they sued, alleging, among other things, that the Bank had breached its loan contract with the Manns, that the Bank had converted the equipment and the Manns' personal CD, and that the Bank had trespassed on the Manns' property. The Manns also alleged that the Bank had defrauded them by promising not to foreclose, by misrepresenting the collateral pledged for a July 1992 loan, and by suppressing material facts contained in correspondence from Globe. Finally, the Manns alleged that the Bank had intentionally interfered with the Manns' business relations with potential investors and with Abyss's business relations with Globe by causing Globe to terminate its relationship with Abyss and by failing to forward correspondence from Globe.
The trial court entered a summary judgment for the Bank on the breach of contract, trespass, and conversion claims. In addition, the trial court entered a summary judgment on the claims based on the Bank's alleged promise not to foreclose, the alleged misrepresentation of the collateral for the July 1992 loan, and the intentional interference with business relations claims premised on interference with potential investors and the termination of Abyss's business relationship with Globe. The fraud and intentional interference claims based upon the Bank's alleged suppression of the facts contained in, or failure to forward, correspondence from Globe are still pending in the trial court. The partial summary judgments were made final pursuant to Rule 54(b), Ala.R.Civ.P.

D. The Appeal
The Manns appealed the trial court's summary judgments to the Supreme Court, which transferred the case to this court pursuant to Ala.Code 1975, § 12-2-7(6). Our standard of review in cases involving summary judgments is de novo, which requires us to apply the same standard as applied in the trial court. A motion for summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P.
When a party moves for a summary judgment, it "must make a prima facie showing that ... no genuine issues of material fact [exist] and that [it] is entitled to a judgment as a matter of law." Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). Once the movant has met this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'"Id. "`Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Id. n. 4 (citing Ala.Code 1975, § 12-21-12, and quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). See West, 547 So.2d at 871, and Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794 (Ala.1989), for further discussion of the application of the summary judgment standard. After considering whether the Bank met its burden under the summary judgment standard, we affirm the trial court's judgment on all counts.

II. Facts

A. The Loans
The collateral for the April 1991 loan included the real estate, the equipment of the gravel business, and the Manns' own CD of $30,000, which was Henry Mann's retirement savings. The loan was structured with seven payments due monthly and a large balloon payment due in December 1991. The Manns and the Bank apparently initially understood that the Manns would not be able to make the balloon payment and that the remaining *1379 balance on the loan would be refinanced with another loan. In fact, in January 1992, the Bank made another short-term loan to the Manns to refinance the remaining balance on the April 1991 loan, with the balance of this renewal note due in March 1992. The January 1992 note indicated that the collateral securing the loan was the real estate and equipment of the business, collateral securing other loans, and deposit accounts. Again, the Manns were unable to pay the balance of the loan on its due date, and again, according to the Bank, the loan was refinanced or renewed by a loan transaction in July 1992. However, the Manns are of the opinion that the July 1992 loan was an entirely new loan.
This difference in opinion forms the basis for several of the claims the Manns asserted against the Bank. The Manns argue that the July 1992 note was secured only by the real estate and not by the equipment or their personal CD, while the Bank asserts that the July 1992 note was secured with the collateral that had secured all prior loans with the Bank, which included the equipment and the Manns' personal CD. When the Bank foreclosed on the July 1992 note, it repossessed the equipment and retained the Manns' CD.

B. The Collateral
Central to the Manns' claims concerning breach of contract, conversion, and fraud is the issue whether the equipment and the CD were actually pledged as collateral for the July 1992 loan. After reviewing the assignment of the certificate of deposit, the loan documents from April 1991, January 1992, and July 1992, as well as loan documents from other miscellaneous loans, and considering the testimony of Henry and Judy Mann, presented by way of deposition, we are of the opinion that the equipment and the CD also secured the July 1992 loan and that they were properly retained or repossessed upon foreclosure.

1. The Certificate of Deposit
The record contains the loan documents from the April 1991, January 1992, and July 1992 loans. On the "Simple Interest Note, Disclosure and Security Agreement" for the April 1991 loan, the collateral listed is the real estate, equipment, and assignment of the Manns' CD. However, this disclosure statement was not the only document executed with regard to the assignment of the Manns' CD; included in the record is another form, entitled "Assignment of Time/Savings Account," which contains the following language:
"For value received, the undersigned... hereby assign(s), set(s) over and transfer(s) to The Bank of Tallassee, all right, title and interest of the undersigned in and to the account [i.e., the Mann's CD] ... for the purpose of securing payment of each and every debt, liability or obligation of every type or description which any of the undersigned may now or at any time hereafter owe to [The Bank of Tallassee], whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is direct or indirect, due or to become due, absolute or contingent or joint and or several (`Obligations').
"... Until this assignment has been released by a writing ... the undersigned shall have no right to make any withdrawals from said account or to the issuance of any new certificate evidencing said account."
(Emphasis added.)
The language in the assignment is very clear. The CD was assigned to the Bank not only for the purpose of securing the April 1991 loan, but also for the purpose of securing any other debt owed by the Manns to the Bank. The January 1992 and July 1992 loans were other debts owed to the Bank, so the CD was collateral for each of those loans as well. The Manns do not argue that the CD was released in writing by the Bank; they only argue generally that the collateral for the April 1991 loan should have been released when that loan was satisfied. Without even a contention that the CD was released in writing as required under the assignment, the Manns cannot succeed in arguing that the CD was not collateral for the July 1992 loan when the assignment clearly states that the CD would be collateral for every debt the Manns owed to the Bank.

2. The Equipment
Although the question concerning whether the equipment was also collateral for *1380 the July 1992 loan is not as simple to decide as the CD issue, the result is still the same. The equipment was listed as collateral on the April 1991 loan documents. The equipment was also listed as collateral on the January 1992 loan documents. As the Manns point out, the equipment is not actually listed on the July 1992 loan documents. However, our inquiry does not end with the discovery that the word "equipment" was not listed on the loan documents.
The Manns received other loans from the Bank for various other expenses associated with the business of running the gravel pit. For example, the Manns took out loans to purchase some trucks for the business and for operating expenses. A close inspection of these loan documents reveals that, in addition to listed collateral, boxes on the loan documents were checked to indicate that "collateral securing other loans [from the Bank] may also secure this loan." This particular box was checked on the July 1992 loan documents.
In addition, the terms of the security agreement are explained in detail on the reverse side of the loan documents. In a section entitled "Secured Obligations," the fact that the named collateral will secure other debts presently or later incurred is stated clearly: "This agreement also secures all other debts I may now or later owe you." After executing several loans with the Bank, the Manns should have been aware that their collateral for any one loan would be considered collateral for all. This type of provision is often called a cross-collateralization clause, and such a clause is valid in Alabama. Ala. Code 1975, § 7-9-204; Ex parte Chandler, 477 So.2d 360, 362 (Ala.1985).
The argument that the July 1992 loan was secured by the equipment is also bolstered by a UCC filing with Henry Mann's signature on it. Attached to the filing is a list of the gravel pit equipment. Although no date appears on the actual form, it was filed on July 17, 1992, two days after the July 1992 loan was closed.
Despite the Manns' argument that the collateral being taken as security for the July 1992 loan was misrepresented to them, which will be addressed in more detail later in this opinion, we conclude that the equipment was collateral for the July 1992 loan.

III. Breach of Contract
The Manns allege that the Bank breached its loan contract with them by failing to release the CD and equipment as collateral when the April 1991 loan was satisfied and paid in full. The Bank argues simply that the July 1992 loan was a renewal or refinancing of the April 1991 loan and that, therefore, the April 1991 loan was not satisfied to the extent that the collateral was due to be released.
A breach of contract is defined as a "failure, without legal excuse, to perform any promise which forms the whole or part of a contract." Black's Law Dictionary 188 (6th ed. 1990); see also 17A Am.Jur.2d Contracts § 716 (1991). To establish that a breach of contract occurred, the "claimant[s] must prove: (1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Southern Medical Health Systems, Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted).
The Manns failed to present substantial evidence of every element of their cause of action for breach of contract. Although the April 1991 loan was paid, it was paid by the proceeds of the July 1992 loan. In addition, the record discloses that the Bank did release the equipment as collateral for the April 1991 loan by filing a termination statement, which terminated its perfected security interest in the equipment. However, that release was in essence ineffectual; the Bank filed another UCC filing on the same equipment after the execution of the July 1992 loan. Because the Manns defaulted on the July 1992 loan, the Bank had a right to the collateral under the July 1992 loan contract. Therefore, even if the Manns performed their obligations under the April 1991 loan contract, they cannot prove that the Bank failed to perform its obligations under that contract simply by pointing out that the Bank took possession of the equipment after their default on the July 1992 loan.
*1381 That portion of the Manns' breach of contract argument based on the Bank's continued possession of their CD is also not supported by the evidence offered by the Manns. The Manns' CD was assigned to the Bank by a separate instrument, and that assignment remains in effect until the Bank releases the CD in writing, as required by the assignment. Therefore, because the Bank had no obligation to release the CD under the terms of the assignment, the Manns cannot produce substantial evidence that the Bank failed to perform its obligations. Without evidence to support their claims that the Bank was under an obligation to release the collateral, the Manns failed to present substantial evidence of the elements of a cause of action for breach; therefore, as to the breach of contract claim, the summary judgment for the Bank is affirmed.

IV. Fraud
The Manns make two allegations of fraud. First, they allege that the Bank, through its representative at the closing of the July 1992 loan, misrepresented the facts concerning the collateral intended to secure that loan. Second, the Manns allege that an attorney for the Bank misrepresented the Bank's intentions regarding the foreclosure. The Manns failed to present substantial evidence of either allegation of fraud to overcome the Bank's motion for summary judgment, and, therefore, we affirm the judgment for the Bank on these two issues.

A. The Misrepresentations Concerning Collateral
On July 15, 1992, the Manns attended the closing of the July 1992 loan. Also in attendance was Carolyn Strength, the secretary to the Bank's attorney. Ms. Strength discussed the loan documents with the Manns and handled the closing. The Manns allege that Ms. Strength, apparently as an agent of the Bank, misrepresented the collateral being taken as security for the July 1992 loan.
To prove fraud, the Manns first have to establish that Ms. Strength made a false representation of an existing material fact. Then the Manns must prove that they justifiably relied upon the alleged misrepresentation and that they suffered damage as a proximate result of that reliance. See Valley Properties, Inc. v. Strahan, 565 So.2d 571 (Ala.1990) (defining fraud).
According to Judy Mann, Ms. Strength represented that the only collateral for the July 1992 loan was the real estate. However, Henry Mann's deposition testimony contradicts his wife's statement. He testified that he understood that the CD was to be collateral for the July 1992 loan. He also indicated that his signature appeared on the UCC filing on the equipment, although he did state that he did not recall actually signing the document. When considered together, Judy Mann's testimony that Ms. Strength stated that the real estate was the only collateral for the July 1992 loan and Henry Mann's understanding that the CD was collateral do not amount to substantial evidence of a misrepresentation by Ms. Strength. In addition, Henry Mann's failure to remember actually signing the UCC filing, in light of the fact that he admits that his signature appears on the document, does not present substantial evidence that the facts concerning the collateral for the loan were misrepresented. Because the Manns failed to present substantial evidence of the alleged fraud, the trial court properly entered summary judgment in favor of the Bank on this claim.

B. The Misrepresentations Concerning Foreclosure
The Manns' second allegation of fraud concerns statements made by one of the Bank's attorneys, Joe Scarborough, in regard to the Bank's decision to foreclose on the gravel pit real estate. This allegation is in the nature of promissory fraud, despite the Manns' attempt to characterize it as ordinary fraud. To prove that Mr. Scarborough committed promissory fraud, the Manns would have to establish (1) that Mr. Scarborough made a false representation concerning the Bank's intent to perform or abstain from performing in the future, (2) that Mr. Scarborough intended for the Bank not to do the act promised at the time of the alleged misrepresentation, (3) that Mr. Scarborough intended to deceive them, (4) that they justifiably relied on this alleged misrepresentation, and (5) that they were damaged as a proximate *1382 result of that reliance. See Howard v. Wolff Broadcasting Corp., 611 So.2d 307 (Ala.1992), cert. denied, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 473 (1993).
According to the Manns, Mr. Scarborough committed fraud by telling Judy Mann that the foreclosure was a mere formality, that nothing would change, that the equipment would not be removed from the property, and that she could continue to seek investors for the gravel pit. The Manns presented substantial evidence that Mr. Scarborough made a representation concerning a future act to be performed by the Bankthe foreclosure and its consequences. They also presented substantial evidence that they relied on this representation by recruiting investors and attempting to secure a buyer for the gravel pit. The Manns even presented substantial evidence that they incurred damage as a result of this reliance by testifying that an investor pulled out of a pending sales agreement after seeing the equipment being removed from the property. However, the Manns failed to present substantial evidence that Mr. Scarborough intended, when he made the representations, that things would change and that the equipment would be removed. In addition, the Manns failed to present any proof that, by making these representations, Mr. Scarborough intended to deceive them. In fact, Judy Mann's own testimony supports quite the opposite conclusion. She points out that Mr. Scarborough did not know that the Bank had removed the equipment from the gravel pit until she told him what had transpired. Without proof that Mr. Scarborough intended to deceive them, the Manns failed to overcome the Bank's motion for summary judgment, and, as to this claim, the trial court properly entered the judgment in favor of the Bank.

V. Intentional Interference with Business Relations
The problems between the Manns and the Bank do not end with the dispute over which collateral secured the July 1992 note. According to the Manns, the Bank intentionally interfered with Abyss's business relations with its customer, Globe. Additionally, the Manns assert that the Bank interfered with their relationships with several potential investors.

A. The Allegations of Interference
During the spring and early summer of 1992, the Manns' gravel business supplied at least two shipments of gravel to Globe. In order to have the operating capital necessary to prepare the gravel and ship it to Globe, the Manns again requested financial assistance from the Bank. The Manns characterize these transactions as "advances"; however, the Bank refers to them simply as loans. Despite the difference in terminology, neither party can dispute that the Bank supplied the Manns with the necessary capital and that the Manns assigned the accounts receivable from Globe as collateral. In fact, the Bank required that Globe mail its payments directly to the Bank and that Globe make its payments out jointly to both Abyss and the Bank. Globe complied with the Bank's request and tendered payment directly to the Bank. Globe also sent all correspondence to the Bank.
When Globe tendered payment to the Bank in June 1992, it indicated through its correspondence that it had deducted from the total amount due an amount to compensate for the portion of substandard gravel it had received and the amount it had paid for shipping charges that one of Abyss's trucking companies had submitted. The Bank took exception to Globe's payment of the shipping charges, which it believed were the responsibility of Abyss. In its letter to Globe, dated July 2, 1992, the Bank demanded an explanation for the deduction, stated its position that the deduction was unauthorized and improper, and indicated that it would, if necessary, take legal action to protect its interests. The Manns alleged that the Bank's threat of legal action against Globe caused Globe to terminate its business relationship with Abyss.[2] The Bank pointed *1383 out that in Globe's letter of June 19, 1992, Globe indicated dissatisfaction with Abyss's product and terminated the business relationship at that time, which was two weeks before the Bank's letter threatening legal action.
The Manns also alleged that the Bank interfered with business relationships between Abyss and potential investors when it removed the equipment from the gravel pit upon foreclosure and when it refused several investment plans submitted by the Manns. Apparently, according to the Manns, the removal of the equipment from the property disturbed the investors, who had been informed that the equipment was included in any prospective purchase. In response, the Bank argues that it had every right to seize the equipment because of the Manns' default and its right to foreclose. In addition, the Bank contends that the Manns have no evidence that investors were looking at the property, that the removal of the equipment ruined any pending purchase of the gravel pit, or that the investment plans developed by the Manns were actually submitted to the Bank.
To establish intentional interference with business relations, a plaintiff must prove: "(1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage ... as a result of the defendant's interference." Utah Foam Products, Inc. v. Polytec, Inc., 584 So.2d 1345, 1352-53 (Ala. 1991). The Manns allege that the Bank interfered with Abyss's business relations with Globe and with their relationships with several potential investors. To defeat a summary judgment motion on this claim, the Manns had to produce substantial evidence to support each element of their cause of action. We will examine the two claims separately to determine whether the Manns met this burden.

B. Interference With Globe
The evidence submitted by the Manns in support of their claim that the Bank intentionally interfered with Abyss's business relations with Globe is meager at best. The Manns rely heavily on the fact that the Bank contacted Globe and threatened legal action in a letter dated July 2, 1996. Judy Mann testified in her deposition that Dave Tuten, the purchasing/material manager at Globe, was very upset over the letter and the threatened lawsuit. She apparently surmised that this problem resulted in Globe's decision to discontinue its relationship with Abyss.
However, the Bank argues that its letter was sent well after Globe had terminated its business relationship with Abyss. As the Bank points out, the June 19, 1992, letter from Globe stated that Globe would not be buying any more gravel from Abyss because its gravel was substandard. In addition, the record contains an affidavit from Mr. Tuten, which states:
"[A]s my June 19, 1992 letter ... indicated, I decided that Globe would not purchase any more material from Abyss because the quality was poor. No other factors played into my decision to discontinue purchases from Abyss.
"... [The] issue regarding payment of freight charges had absolutely nothing to do with Globe's decision not to purchase any more gravel from Abyss."
Although the Manns dispute the reasons behind Globe's decision to discontinue its relationship with Abyss, they failed to present substantial evidence of the elements of their cause of action. Most importantly, the Manns failed to present substantial evidence that Abyss had business relations with Globe at the time of the Bank's letter. Because Mr. Tuten terminated Globe's relationship with Abyss before July 2, 1992, the Manns cannot prove that Abyss had business relations with Globe when the Bank wrote its letter, and they certainly cannot prove that the Bank intentionally interfered in a nonexistent business relationship. After reviewing the letter from Globe and after considering Mr. Tuten's affidavit, we conclude that the trial court properly entered the summary judgment for the Bank insofar as it relates to *1384 the Manns' claim of intentional interference with business relations between Abyss and Globe.

C. Interference with Potential Investors
The Manns' claim against the Bank regarding alleged interference with potential investors is also largely unsupported. Apparently, the Manns' argument is that the Bank interfered with their relationships with potential investors by removing the equipment from the gravel pit and by padlocking the gate to the gravel pit. Judy Mann testified that she had contact with several potential investors, and, in fact, she even gave names. The Bank argues that it cannot be liable for interference with any potential investors on the basis of the exercise of its rights to foreclose on the property and to seize collateral upon the Manns' default.
As was addressed more completely in the appropriate section of this opinion, the Bank did have the right to seize the equipment because it was collateral for the July 1992 loan. The Manns do not dispute the fact that the real estate was indeed collateral for the July 1992 loan. We cannot find any evidence that the Bank's exercise of its right to foreclose or repossess collateral was an intentional act meant to interfere with the relationship between the Manns and any potential investors. Without proof that the Bank intentionally interfered with the business relationships between them and their potential investors, the Manns cannot succeed on their claim. The trial court properly entered the summary judgment for the Bank on this particular claim.
In addition, the Manns allege that the Bank's refusal to accept investment plans interfered with their relationships with potential investors. However, the Manns do not present any documentary evidence of the investment plans that were allegedly refused or turned down by the Bank. In her deposition, Judy Mann indicates that the investor who proposed a plan to catch up the payments due on the July 1992 loan did not deal with the Bank directly. Judy Mann states that she proposed the plan to Joe Scarborough, an attorney for the Bank, and she describes the offer and its result as follows:
"A: At one time we offered to catch up the payments and the Bank of Tallassee refused according to Mr. Scarborough.....
"....
"Q.: Was that [offer] made in writing?
"A.: No.
"....
"A.: I couldn't understand why they wouldn't agree to let me catchoh, I know what he said to me. He said, `Make an offer.' And I said, "You're asking me to make an offer?' ... And I didn't even go any further with it because I felt like they weren't going to let me catch the payments up...."
Even if Mr. Scarborough did relay the Manns' proposal to the Bank and even if it was turned down, the Manns still failed to present substantial evidence that the Bank intentionally interfered with their relationship with any potential investors. The Bank certainly has the option to accept an offer to catch up mortgage payments; however, the Manns offered no proof that the Bank was required to accept their proposal. We find no evidence in the record to support the Manns' apparent contention that the Bank is guilty of some wrongdoing for making a business decision in this situation. Again, the Manns failed to produce proof that the Bank intentionally interfered with their business relations, and the trial court properly entered the summary judgment for the Bank on this claim.

VI. Conversion
The Manns also allege that the Bank converted the gravel pit equipment and their CD. To recover for conversion of the equipment and their CD, the Manns must first show that they had "general or special legal title to the [equipment and CD at the time of the alleged conversion] or the immediate right to possession." Ott v. Fox, 362 So.2d 836, 839 (Ala.1978) (citations omitted); see also Davis v. Ford Motor Credit Co., 599 So.2d 1123, 1126 (Ala.1992); Driver v. Hice, 618 So.2d 129, 131 (Ala.Civ.App.1993). In addition, the Manns must show that the Bank "wrongful[ly] exercise[d] ... dominion over [their equipment or CD] in exclusion or *1385 defiance of [their] rights." Ott, 362 So.2d at 839 (citations omitted).
After reviewing the record, we conclude that the Manns did not present substantial evidence that they had title to, or the right to the possession of, the equipment or the CD at the time of the alleged conversion by the Bank. Both parties agree that the Manns had not made payments on the July 1992 loans. Upon the Manns' default, the Bank had the right to seize the collateral that secured the loan. Ala.Code 1975, § 7-9-503. As previously discussed, the equipment and the CD were in fact collateral for the July 1992 loan. The trial court properly entered the summary judgment in favor of the Bank on the Manns' conversion claim, and as to that claim the judgment is affirmed.

VII. Trespass
The final argument presented by the Manns is that the Bank trespassed upon their property when it seized the equipment from the gravel pit. Neither party disputes that the Manns were in default on at least the July 1992 loan. The equipment was collateral securing that loan. In fact, the real estate upon which the Bank allegedly trespassed secured that loan. The Bank foreclosed on the real estate in April 1993. The alleged trespass occurred in January 1994.
In Alabama, a mortgage automatically passes title in the property to the mortgagee. Mallory v. Agee, 226 Ala. 596, 147 So. 881 (1932). A mortgagor has only the equity of redemption in the property. Mallory, 226 Ala. at 600, 147 So. at 883. The Manns, then, had only the equity of redemption in the gravel pit property from the time that they signed the April 1991 loan. When the Bank foreclosed on the property, the Manns still had the right to redeem the property, Mallory, 226 Ala. at 599, 147 So. at 882; however, the Bank had title and the right to possession. Connecticut General Life Insurance Co. v. Smith, 226 Ala. 142, 145, 145 So. 651, 654-55 (1932). Thus, the Bank had the right to enter upon the real estate at will, and its title and right to possession are an absolute defense to an action for trespass. Southern Ry. Co. v. Sanford, 262 Ala. 5, 8, 76 So.2d 164, 167 (1954). Accordingly, as to the Manns' claim of trespass, the summary judgment for the Bank is affirmed.

VIII. Conclusion
The Manns failed to present substantial evidence of any of their claims against the Bank. Without such evidence, the trial court was required to enter a summary judgment in favor of the Bank on each one of those claims. We agree that the Bank was entitled to a judgment as a matter of law, and we affirm the trial court's judgment on all claims raised by the Manns.
AFFIRMED.
THIGPEN, YATES, and CRAWLEY, JJ., concur.
ROBERTSON, P.J., and MONROE, J., concur in part and dissent in part.
MONROE, Judge, concurring in part and dissenting in part.
I must respectfully dissent from the majority's opinion as it relates to the bank's wrongful repossession of the plaintiffs' equipment. The documents creating the loan at issue do not list the equipment as collateral. After reviewing the record, I have found no evidence that the equipment was listed as collateral for any additional, then-existing loans. This, in addition to plaintiffs' testimony, constitutes substantial evidence creating a genuine issue of material fact regarding whether the equipment was actually collateral for the loan at issue.
Because of the existence of this issue of material fact, I would reverse the trial court's judgment on the following claims as to the equipment only: (1) breach of contract; (2) misrepresentation (as to the collateral securing the loan); and (3) conversion. Therefore, I must dissent to those portions of the majority's opinion in which the majority affirms these claims.
I would affirm, and therefore I concur with the majority's opinion, as to all claims involving the certificate of deposit and as to the claims of fraud (regarding the bank's alleged promise not to seize the property), intentional *1386 interference with business relations, and trespass.
ROBERTSON, P.J., concurs.
NOTES
[1] All loans with the Bank were made to the Manns' corporation, Abyss Sand and Gravel, Inc. Although Abyss and the Manns filed this action, for ease of reading and simplicity we will simply refer to the plaintiffs as the Manns.
[2] Because Globe sent its correspondence meant for Abyss to the Bank and because the Bank did not forward Globe's correspondence to Abyss, the Manns argue that the Bank also intentionally interfered with Abyss's business relations with Globe by retaining Globe's correspondence. However, the trial court denied the Bank's motion for summary judgment on this claim, so it need not be addressed in this appeal.